## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

BRENT JACOBY,                          )
                                       )
    Plaintiff,                     )
                                       )
v.                                     ) Case No.: 4:16-cv-0728-MHH-TMP
                                       )
CARTER, Warden, et al.,                )
                                       )
    Defendant.                     )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The plaintiff, Brent Jacoby, filed an amended *pro se* complaint pursuant to 42 U.S.C. § 1983 alleging that rights, privileges, or immunities afforded him under the Constitution or laws of the United States were abridged during his incarceration at St. Clair Correctional Facility in Springville, Alabama ("SCCF").[1] (Doc. 12-1). The plaintiff names as defendants Warden Karen Carter, Warden DeWayne Estes, Warden Cedric Specks, Lieutenant Russell Jones, Commissioner Jefferson Dunn, Dr. Wilson, Captain Gary Malone, Sergeant Jonathan Truitt,[2] Officer Justin Guthery, Captain Carla Graham, Nurse Hamby, Dorothy Coogan,

---

[1] The plaintiff was since transferred to Limestone Correctional Facility in Harvest, Alabama. (Doc. 54 at 1). On April 27, 2017, the plaintiff informed the court that he had again been transferred and is now in Staton Correctional Facility, in Elmore, Alabama. (Doc. 91).

[2] Although the plaintiff identified this defendant as "Jonathan Truit," the court refers to him as "Truitt" as that is the spelling used by the defendants. (*See e.g.*, doc. 61-5).

Richard Payne, Tarrant Payne, and De Marko Gaines. The plaintiff complains that his Eighth Amendment rights were violated by the defendants, for which he seeks injunctive and monetary relief. In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

## I. Procedural History

On August 11, 2016, the undersigned entered an Order for Special Report directing the Clerk to forward copies of the complaint to each of the named defendants and directing the defendants to file a special report addressing the plaintiff's factual allegations. (Doc. 13). The undersigned advised the defendants that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, the court would considered it as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. (*Id.*). The order advised the plaintiff that, after he received a copy of the special report, he would have twenty-one days to file his initial disclosures pursuant to Rule 26(a)(1), Federal Rules of Civil Procedure.

After multiple extensions of time, on December 6, 2016, defendants Gaines, Dunn, Carter, Truitt, Malone, Tarrant Payne, Estes, Graham, Guthery, Specks, and

Jones filed a special report. (Doc. 61). On December 12, 2016, defendants Coogan and Richard Payne filed a special report (doc. 62), and on December 21, 2016, defendants Hamby and Wilson did likewise (doc. 65). On January 3, 2017, the undersigned notified the parties that the court would construe each of the special reports as a motion for summary judgment and notified the plaintiff that he had twenty-one (21) days to respond to the motion for summary judgment by filing affidavits or other material. (Doc. 66). The undersigned also advised the plaintiff of the consequences of any default or failure to comply with Fed. R. Civ. P. 56. (*Id.*). *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).

The plaintiff then filed a motion for extension of time and for discovery. (Docs. 67-69). The court granted the discovery requests in part and allowed the plaintiff additional time to respond to the pending motions, specifically until March 1, 2017. (Doc. 70). After additional extensions of time, on April 4, 2017, the plaintiff filed responses to the special reports and evidence in support of his responses. (Docs. 78-79, 84-91).

This matter is now before the court on the defendants' motions for summary judgment (docs. 61, 62, and 65) and the plaintiff's opposition thereto (doc. 88-91).

## II. Standard of Review

Because the court has construed the defendants' special reports as motions for summary judgment, Fed. R. Civ. P. 56 governs the resolution of the motions. Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000). The burden of proof is on the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues of material fact and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case

necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532.

However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). Additionally, because the plaintiff is *pro se*, the court must construe the complaint more liberally than it would pleadings drafted by lawyers. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). "*Pro se* pleading are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Boxer X v. Harris*, 437 F.3d 1107, 1110 (11th Cir. 2006).

### III. Summary Judgment Facts

The plaintiff alleges that due to defendant Commissioner Dunn's failure to ensure that wardens are properly running the prisons, and due to defendants Warden Carter,[3] Warden Estes, and Warden Specks' failure to enforce the Alabama Department of Corrections ("ADOC") policies, the resulting environment

---

[3] Warden Carter worked at SCCF during the relevant time period. She has since been transferred to a different correctional facility. (Doc. 61-11).

at SCCF allowed the plaintiff to be kidnapped, sold, raped, and beaten by other inmates. The defendants deny any of this occurred and instead assert that the plaintiff was high on drugs and that other prison inmates, rather than raping and beating the plaintiff, were trying to help him.

The plaintiff claims the inmates run SCCF. Cell doors do not lock and inmates move from one cell to another and sleep wherever they want. (Doc. 12-1 at 6). Because inmates have torn up the cell light fixtures to charge mobile phones, many of the cells are without working lights. (*Id.*, at 7). Large numbers of mobile phones, drugs, and free world knives are present. (*Id.*, at 8). No metal detectors or cameras are in use and no cell searches are done, despite ADOC policy otherwise. (*Id.*, at 7-8).

Wardens Specks, Estes, and Carter failed to ensure officers were stationed in the dorms to protect inmates and reduce violence and contraband. (Doc. 12-1 at 8). The prison does not have enough officers to adequately staff it. (*Id.*). Only one officer works in the cube at a time, and often no officers are present in the segregation unit. (*Id.*). Moreover, the plaintiff alleges that Commissioner Dunn and Wardens Carter, Estes, and Sparks are aware of the problems and violations of constitutional rights but have done nothing to the correct the issues. (*Id.*, at 9).

Because of the prison conditions allowed to exist, the plaintiff was sold, beaten, and raped. (Doc. 12-1 at 11). Specifically, the plaintiff alleges that when he arrived at SCCF in early December 2015, he was assigned a cell in M-2 Dorm, but someone was already living there and would not move. (*Id*., at 6). Thus, the plaintiff moved into a cell to which he was not assigned, that being cell M-34, with inmate Derik Burt. (*Id*., at 6, 11). The plaintiff claims his only options were to be inmate Burt's "ho"[4] or go to lock up in protective custody. (*Id*.). The plaintiff therefore chose to be Burt's "ho." (*Id*.). Burt took all the money the plaintiff received on his books. (*Id*., at 12).

The plaintiff went to other inmates for help and met inmate Octavius Bufford a/k/a "Black Jesus." (Doc. 12-1 at 12). The plaintiff and several other inmates stayed in inmate Bufford's cell and Burt sold the plaintiff to Bufford for 20 bags of coffee and a $75.00 store purchase. (*Id*.). Bufford also made the plaintiff put money in Bufford's account and forced him to run scams with pre-paid credit cards. (*Id*., at 13). Bufford smoked crack and would make the plaintiff come into his cell to have sex with him. (*Id*.). In late January or early February 2016, Bufford put a knife to the plaintiff's throat and demanded the plaintiff get

---

[4] The term is prison slang for a prisoner in sexual or financial bondage to another prisoner.

him money, telling the plaintiff he owed Bufford because Bufford could have prostituted him out. (*Id.*, at 13).

The plaintiff reported these events to defendants Captain Graham, and Ms. Coogan and Mr. Payne of Mental Health.[5] (Doc. 12-1 at 12-13). Ms. Coogan's notes reflect that the plaintiff said "I been sold – unwanted relationships. . . . Guy that got stabbed was the one who bought me and beat me up. I felt better [when] I found out that he got stabbed. My bill got paid yesterday. The dude who bought me paid $175.00. He was short $75.00 I paid it." (Doc. 91 at 100). Ms. Coogan reported this to Mr. Payne. (Doc. 62-1 at 3-4). In turn, Mr. Payne reported the plaintiff's claims to Captain Graham, but nothing was done.[6] (Doc. 12-1 at 13).

---

[5] Defendants Coogan and Payne are employed by MHM Services, Inc., to provide mental health care to inmates housed at St. Clair Correctional Facility. (Docs. 62-1 at 2; 62-2 at 2). They do not dispute the plaintiff made this report to them on February 12, 2016. (Doc. 62 at 2).

[6] No evidence supports the plaintiff's assertion that Warden Carter was notified of this incident. All of the records generated on February 12, 2016, refer to Warden Specks being present. According to the defendants, defendant Payne emailed Lieutenant Gordy, the PREA coordinator, concerning the plaintiff's report of sexual abuse to defendant Coogan. (Doc. 61-1 at 2, doc. 61-2 at 1). Payne asked Gordy to speak to the plaintiff, because the plaintiff would not elaborate on his report to defendant Coogan. Defendant Captain Graham then called defendant Payne and asked why nothing was reported to the shift commander, and instructed Payne that all such reports of sexual abuse and/or harassment must be reported to the shift commander. Captain Graham then told Sergeant Larry Baker to bring the plaintiff to Graham's office. (Doc. 61-2 at 1). Additionally Graham and Gordy reported the incident to Warden Specks. (Doc. 61-1 at 2, doc. 61-2 at 2). Baker returned with the plaintiff, and Captain Graham asked the plaintiff about the sexual abuse he reported. (Doc. 61-2 at 1). The plaintiff denied any such report, to which Graham suggested he go to the infirmary just to be checked out. (*Id.*). The plaintiff refused, adding that he was okay, did not need PREA involved, and that no physical or sexual assaults had happened that day. (*Id.*, at 1-2). Defendant Payne was then summoned to Captain

The plaintiff signed a statement on February 12, 2016, that he did not need PREA[7] involved. (Doc. 61-1 at 4). However, the plaintiff explains in his response that all of these defendants told the plaintiff that because he was not sexually or physically assaulted on that particular day, they could not do anything for him.[8] (Doc. 89 at 3). The defendants had the plaintiff write a statement that he had not been assaulted on that particular day. (Doc. 91 at 103). The plaintiff asserts in his amended complaint that he requested to be placed in protective custody, but Captain Graham told him to be patient because protective custody did not have any open beds. (Doc. 12-1 at 13). While evidence in the record reflects that on February 12, 2016, the plaintiff signed a "Release of Liability" stating that he could live in population "without any problems and I have no known enemies at this institution. . . . I hereby relieve any and all DOC officials of any liability and damages" (doc. 61-1 at 5), his mental health records generated the same date reflect that the plaintiff related that he was being bought and sold by two inmates,

---

Graham's office, where he related that the plaintiff had stated he was tired of being bought and sold to different inmates. (Doc. 61-1 at 2.). However, like the plaintiff, defendant Payne denied that the plaintiff stated he had been sexually assaulted. (Doc. 61-2 at 2). Captain Graham then had the plaintiff sign a release of liability form and he was returned to population. (*Id.*, at 2).

[7]  The Prison Rape Elimination Action of 2003 ("PREA"), codified at 42 U.S.C. §§15601-09, was enacted to lessen the incidence of rape in prison. It focuses on compiling statistics and developing standards to achieve its goals.

[8]  As noted above, much of the evidence generated from the February 12, 2016, investigation is contradictory.

that he was anxious, depressed, agitated, and angry (doc. 91 at 101). Additionally, he stated that he wanted to go to the T.C. Program. (*Id.*).

The plaintiff further claims that defendant Graham stated she would move the plaintiff to a different part of the prison or to the T.C. program, but he was not moved. (Doc. 12-1 at 13). According to Graham, the plaintiff did ask her about being moved to the T.C. Program "but inmate Jacoby know[s] the process of how to go by in getting into the TC Program. He has to fill out the application and then get approved for the program. Once approved, then he would be moved down in the program so he can't blame me for not getting into the program."[9] (Doc. 61-2 at 2).

Several days after the plaintiff reported his problems with Bufford, Bufford was stabbed while robbing another inmate. (Doc. 12-1 at 13). Bufford was taken to the hospital, and then placed in segregation. (*Id.*). However, Bufford communicated with other members of his gang to get money from the plaintiff. (*Id.*). During this time, the plaintiff was sold to inmates Ellis Diggs and Willie Jenkins, in exchange for money, shower slides, and drugs. (*Id.*). Diggs and Jenkins forced the plaintiff to request a transfer to N-Dorm. (*Id.*, at 14). Jenkins would not let the plaintiff leave the dorm unless he put money in Jenkins' account.

---

[9] Defendant Graham provided no insight as to how she could state with certainty what the plaintiff "knows." (Doc. 61-2 at 2). Because such statements are inadmissible, defendant Graham's opinion of what the plaintiff knew is due to be and hereby is **STRICKEN.**

(*Id.*).  The plaintiff and another inmate named Don were forced to help Jenkins run scams.  (*Id.*).  Jenkins and Diggs hit the plaintiff and Don, would make the plaintiff and Don get under their beds, and used their cell phones to record the plaintiff and Don crying, screaming and performing sexual acts.  (*Id.*).  Then, one day while Jenkins was sleeping off his methamphetamine high, the plaintiff sneaked out of the dorm and went to inmate Wheeler for help.  (*Id*)

The plaintiff asked Wheeler to help him get into protective custody.  (Doc. 12-1 at 14).  This was on March 5, 2016.  (*Id.*, at 15).  The plaintiff wanted to be in a relationship with Wheeler, and Wheeler told Jenkins and Diggs that he would give them $300.00 for the plaintiff.  (*Id.*).  They responded that they wanted $700.00.  (*Id.*).  Members of Jenkins and Diggs' gang forced the plaintiff to return to Jenkins and Diggs.  (*Id.*).  Diggs hit the plaintiff a few times, then Jenkins told Diggs to leave and proceeded to rape the plaintiff.  (*Id.*).  The plaintiff realized he was bleeding, but he lay there and cried, then pulled up his pants without cleaning up.  (*Id.*).  Jenkins held the plaintiff hostage in his cell, not allowing him to shower, eat or sleep.  (*Id.*, at 15-16).  Jenkins and Diggs beat the plaintiff, breaking his ribs and a finger, urinated on the plaintiff, and tortured him.  (*Id.*).  Inmates Jenkins and Diggs recorded their actions and showed the video clips to defendant Officer

Tarrant Payne,[10] who worked the N-Dorm cube on March 7, 2016, on the 6 p.m. to 6 a.m. shift and to defendant Officer DeMarco Gaines,[11] who worked the N-Dorm cube on March 8, 2016, on the 6 p.m. to 6 a.m. shift. (*Id.*). The plaintiff mouthed "help" to both of these officers, but they ignored him. (*Id.*). The plaintiff asserts that Jenkins also showed "Turner," defendant Lieutenant Jones, and maybe defendant Sergeant Truitt videos of his treatment of the plaintiff. (*Id.*, at 17). The abuse by Jenkins and Diggs continued until March 9, 2016, when a code was called. (*Id.*, at 16). During the ensuing chaos, the plaintiff escaped to the shift office. (*Id.*, at 16-17).

The plaintiff told defendant Sergeant Truitt that he had been held and sexually assaulted by inmate Willie Jenkins for 33 hours.[12] (Doc. 61-5).

---

[10] This defendant was referred to as John Doe #1 in the plaintiff's amended complaint, but has since been identified as Officer Tarrant Payne. (Doc. 43).

[11] This defendant was referred to as John Doe #2 in the plaintiff's amended complaint, but has since been identified as Officer Gaines. (Doc. 43-1). Gaines denies any inmate ever showed him pictures of another inmate on a cell phone, and notes that he would have confiscated the phone and taken disciplinary action against inmate Jenkins had this occurred. (Doc. 61-4). Defendant Gaines' affidavit is somewhat contradicted by an I&I report relying on the cell phone video taken by inmate Jenkins to support a finding that the plaintiff's claims were unfounded. The defendants do not dispute that inmate Jenkins was not disciplined in any way, including for possession of a cell phone.

[12] Inmate Jenkins denied any of this occurred. He turned over his cell phone and witnesses' statements gathered by him to Sergeant Truitt as evidence. (Doc. 61-5). According to the I&I report, the videos on Jenkins' cell phone showed the plaintiff acting out of control and under the influence of some substance during the time he claimed he was forced to perform oral sex. (*Id.*, doc. 61-1 at 9). No evidence of any investigation by anyone other than inmate Jenkins has been provided by the defendants, and the I&I report summarizes the statements obtained by

Defendant Truitt notified PREA Compliance Manager Angela Gordy and I&I Investigator Terry Loggins of the plaintiff's allegations. (Doc. 61-1 at 9). From the shift office, the plaintiff went to the medical department, where multiple bruises to the plaintiff's head, neck and ears were noted.[13] (Doc. 12-1 at 18; doc. 61-1 at 8). Medical staff authorized the plaintiff to be transported to the Rape Crisis Center.[14] (Doc. 12-1 at 18; doc. 61-1 at 6).

To transport the plaintiff to the Crisis Center, defendants Guthery and Tarrant Payne shackled the plaintiff's legs and handcuffed him with his hands behind his back. (Doc. 12-1 at 18). The plaintiff asked to be handcuffed in front because of his ribs, but these officers refused, as did Sergeant Truitt and Lieutenant Jones.[15] (*Id.*). At the Crisis Center, the nurses asked if the plaintiff's handcuffs

---

inmate Jenkins, as well as relies on the cell phone video taken by him. (Doc. 61-1 at 9).

[13] The I&I report found the recorded bruises were consistent with the plaintiff beating his head against the wall. (Doc. 61-1 at 9). According to this report, the cell phone video footage shows the plaintiff appearing intoxicated, screaming, and banging his head against the wall. (*Id.*). The I&I report states that, in the video on inmate Jenkins' cell phone, inmate Jenkins is seen holding the plaintiff in an attempt to keep the plaintiff from injuring himself. (*Id.*). Also according to the I&I report, the videos do not reflect any forced sexual acts. (*Id.*, at 10). However, the videos themselves have not been submitted as evidence by any party. While the body chart reflects bruising on the side of the plaintiff's neck (doc. 61-1 at 3), beating ones head against a wall does not explain the bruising to the side of the plaintiff's neck, or his broken rib.

[14] Neither the claim of the video content nor the statements of inmates gathered by Jenkins can be reconciled with the decision to take the plaintiff to the Crisis Center for a rape examination.

[15] According to Guthery, the plaintiff became agitated about the handcuffs and told defendant Guthery "if you take me out of these handcuffs you are gonna have to fight me."

could be removed, or moved to the front, but Guthery refused.[16]  (*Id*., at 19).  The nurses again asked if the cuffs could be removed so the plaintiff could be examined.  (*Id*.).  Guthery called Sergeant Truitt and Lieutenant Jones and when he hung up, Guthrie said the cuffs could not be removed.[17]  (*Id.*).  Guthery and Payne told the nurses to cut the clothes off of the plaintiff but the nurses responded they did not do exams under these circumstances and the plaintiff agreed they should not even try.[18]  (*Id*.).

When the plaintiff returned from the Crisis Center, he was placed in segregation in the disciplinary dorm.[19]  (Doc. 12-1 at 20).  Defendant Truitt

---

(Doc. 61-8 at 1).

[16]  Defendant Jones also stated they did not remove the handcuffs because of the threats the plaintiff made toward the officers.  (Doc. 61-6 at 1).

[17] Truitt told the officers not to remove the restraints because of the threats made by the plaintiff.  (Doc. 61-5).

[18] The defendants claim that the plaintiff refused to finish the examination, so defendant Guthery called defendant Truitt, who instructed Guthery to have the charge nurse write a statement.  (Doc. 61-1 at 6, doc. 61-5, doc. 61-6 at 2).  The only statement in the record from a nurse was submitted by the plaintiff.  That statement reflects that the nurse was "unable to complete exam [because] patient/survivor unable to get re-dressed after exam.  Correction officers T. Payne and J. Guthery were unwilling to remove hand shackles for exam.  I could cut clothes off for exam but client would have to ride home with shirt draped over him & was unwilling to be degraded in this manner."  (Doc. 91 at 154).  No mention of an exam being prevented by the plaintiff's behavior is made in this report.

[19] The I&I report reflects that the plaintiff asked to be placed in segregation.  (Doc. 61-1 at 8).

ordered inmate Jenkins to write a statement about this incident, had Jenkins medically examined, and then returned Jenkins to population. (Doc. 61-1 at 6).

The I&I investigator attempted to interview and tape record the plaintiff's statement, but wrote that the plaintiff became belligerent, necessitating his removal from the interview because of his behavior. (Doc. 61-1 at 10). In contrast, the plaintiff states he asked for a lawyer during the interview, at which point the investigator turned off the tape recorder and left. (Doc. 88 at 17-18). The I&I report findings rely entirely on the inmate statements gathered by inmate Jenkins (Doc. 61-1 at 9). Those witnesses all stated that the plaintiff owed money to inmate Jenkins, that Jenkins told the plaintiff to stop smoking "no show" and that Jenkins would help the plaintiff reduce the debt.[20] (Doc. 61-1 at 12, 13, 14, 16). The witnesses further asserted that the plaintiff smoked a large amount of "no show" and then began "wigging out." (*Id.*). The plaintiff notes each of these witnesses' statements are undated and unsworn, and further claims they are all from individuals in the "Crips" gang with Jenkins, except for Cedric Sturdivant, who was Jenkins' consensual "ho." (Doc. 88 at 17). Because no evidence corroborated the plaintiff's claims, I&I closed the investigation as "unfounded."

---

[20] As previously noted, inmate Jenkins gathered these statements. (*See e.g.*, doc. 61-1 at 6 (stating inmate Jenkins denied the incident and had several other inmates write statements denying the incident)).

(Doc. 61-1 at 10). The plaintiff asserts that no evidence was ever obtained from him before the I&I investigator reached this conclusion. (Doc. 88 at 17).

On March 16, 2016, the plaintiff went in front of the segregation board. (Doc. 12-1 at 20). Warden Specks, Captain Malone, Mr. Payne, and others present saw that the plaintiff was bruised and in soiled clothes.[21] (*Id.*, at 21). The plaintiff told them that he had no clothes, had not had a shower in almost two weeks, did not have any of his property and had broken ribs and a broken finger.[22] (*Id.*).

According to the plaintiff, defendant Dr. Wilson failed to see the plaintiff for 34 days. (Doc. 12-1 at 20). The plaintiff wrote to Commissioner Dunn asking for assistance, but Dunn did not answer him. (*Id.*, at 21). The plaintiff also asserts that he completed numerous sick call requests for medical attention during this

---

[21] Defendant Richard Payne denies he was present at the March 16, 2016, segregation board hearing. (Doc. 62-2 at 6). Mr. Payne only attends such hearings when a mental health opinion is needed on the competency of an inmate. (*Id.*). This was not the case at the March 16, 2016, hearing. (*Id.*). However, Mr. Payne met with the plaintiff on March 28, 2016, to assess his competency to proceed in disciplinary actions against him from the March 9, 2016, and March 24, 2016, incidents. (*Id.*, at 6-7). The bases for those disciplinary actions, including any description of what the March 9, and March 24, 2016 incidents involved, has not been provided to the court.

[22] According to defendants Malone and Specks, when the plaintiff appeared before the segregation board on March 16, 2016, the plaintiff asked for clothes and his personal property, which were provided to him. (Doc. 61-9, doc. 61-10). The plaintiff did not mention any problems and made no complaints. (*Id.*). However, the defendants do not explain why the plaintiff would need clothes if clean clothing had been provided during the week he already had been in segregation. Moreover, although Specks claims in his affidavit that he had no knowledge of the "complaints inmate Jacoby stated that occurred in population," that assertion is refuted by defendant Graham's report to Specks that the plaintiff was being bought and sold. (Doc. 61-1 at 2).

time period, but defendant Nurse Hamby, who is in charge of scheduling, failed to get the plaintiff a timely appointment.[23] (*Id.*, at 20).

The medical records submitted as evidence reflect the following: The plaintiff completed a sick call request on March 13, 2016, stating he was kidnapped, extorted for money, raped and physically beaten.[24] (Doc. 65-6 at 4). The plaintiff filed another sick call request form on March 14, 2014, and was seen on March 16, 2016. (Doc. 65-1 at 3; doc. 65-6 at 2). His right hand was noted to hurt and the plaintiff was prescribed ibuprofen for tenderness. (Doc. 65-6 at 3).

The plaintiff filed further sick call requests on March 20 and March 22, 2016, again complaining of tenderness in his left rib cage and right hand, and that he was coughing up blood. (Doc. 65-5 at 21, doc. 65-6 at 1). A March 23, 2016, sick call request stated that the plaintiff needed his mental health medication changed because it was making him sick to his stomach and he had not taken it in two weeks. (Doc. 65-7 at 9). A referral was made to mental health for the plaintiff's medication the following day. (Doc. 65-7 at 8). The plaintiff was examined by a nurse practitioner on March 29, 2016. (Doc. 65-4 at 16). That

---

[23] During the relevant time period, Edwina Hamby, R.N., was the Health Services Administrator, and not in charge of scheduling. (Doc. 65-2 at 2-3). Dr. Wilson was the medical director. (Doc. 65-1 at 2).

[24] This sick call request, in which the plaintiff asserts he was kidnapped, raped, and beaten, bears the notation "Previously Addressed." (Doc. 65-6 at 4).

nurse ordered x-rays of the plaintiff's ribs and right hand, and instructed the plaintiff to follow up with medical staff in one week. (*Id*.). The plaintiff was again prescribed ibuprofen. (*Id.*). The x-rays were taken on March 30, 2016. (Doc. 65-6 at 17-18). They reflected that the plaintiff had a healing fracture of his tenth rib on the left, but no fracture or dislocation in his right hand. (*Id*.). Also on March 30, 2016, the plaintiff again saw the nurse practitioner. (Doc. 65-4 at 16). The plaintiff was told he could see Dr. Wilson, the medical director, but the plaintiff declined. (*Id*.). However, the nurse practitioner discussed the plaintiff's condition with Dr. Wilson, who instructed that the plaintiff be kept on Motrin for 30 days. (*Id.*). On April 5, 2016, the plaintiff refused to be seen by a doctor or make a sick call visit. (Doc. 65-8 at 20). The plaintiff finally saw Dr. Wilson on April 12, 2016. (Doc. 12-1 at 21). The plaintiff asserts that Dr. Wilson told him that his ribs and finger had been broken but they had healed. (*Id.*).

In a medical grievance dated March 18, 2016, the plaintiff reported he was the victim of kidnapping, extortion, and rape from March 5 through 9, 2016. (Doc. 1 at 28). He stated he was in pain and had not been seen by a doctor. (*Id.*). A sick call request form completed by the plaintiff on March 20, 2016, references that it is his fifth request, he has horrible pain in his chest from his ribs and had a discolored, dislocated, or broken finger. (*Id.*). In a grievance appeal dated

March 30, 2016, the plaintiff related that he did not have an x-ray until March 30, still had not seen a doctor, and that officials were covering up the reported rape. (*Id.*, at 29). Hamby discussed these grievances with Dr. Wilson, who instructed her that he would examine the plaintiff. (Doc. 65-1 at 5; doc. 65-5 at 20). In a response to the first medical grievance, on April 7, 2016, Nurse Hamby responded that the plaintiff was prescribed Tylenol #3 for 5 days and scheduled to see the doctor on April 12, 2017. (Doc. 65-2 at 3). In response to the second medical grievance, also dated April 7, 2016, Nurse Hamby stated that no one was trying to cover up his rape and it was being taken seriously.[25] (Doc. 1 at 29). She further encouraged the plaintiff to speak with mental health about "the situation that occurred." (*Id.*).

Later medical records reflect that on April 9, 2016, the plaintiff submitted another sick call request concerning a toothache and ear pain. (Doc. 65-5 at 2). In accordance with his instructions to Nurse Hamby, Dr. Wilson examined the plaintiff on April 12, 2016. (Doc. 65-1 at 6). Dr. Wilson noted a healing fracture of the left tenth rib, a toothache, and tenderness in the left ear, possibly from an infected Eustachian tube. (Doc. 65-4 at 14). Dr. Wilson discussed the x-ray

---

[25] In response to the second grievance, defendant Hamby states she discussed the plaintiff's claim of rape with Dr. Wilson on April 7, 2016, although Dr. Wilson refers only to the plaintiff's "purported discomfort and a rib fracture from an alleged altercation . . . ." (Doc. 65-1 at 5, 65-5 at 20).

results with the plaintiff, continued him on Ibuprofen, and prescribed prednisone and amoxicillin for the ear infection. (Doc. 65-1 at 5; doc. 65-4 at 14). He also made a referral to the dental staff for the toothache.[26] (Doc. 65-4 at 14). During the April 12, 2016, examination, the plaintiff did not mention any sexual assault. (Doc. 65-1 at 5).

The plaintiff again submitted a request for health care on April 22, 2016, and was seen the same day. (Doc. 65-5 at 19). Although he complained of back pain, he rated his pain as a 0 on a scale of 1 to 10 and stated the only thing that helped his back pain was drugs. (Doc. 65-5 at 17). The nurse noted the plaintiff's gait was unsteady, his eyes were red, and his pupils were dilated. (*Id*., at 18). On May 2, 2016, the plaintiff requested medical care, again due to back, hand, and rib pain, and again requested pain medication. (Doc. 65-5 at 10). He stated he did not want to see a nurse, but just wanted Ultram/Tramadol prescribed. (*Id*.). He refused to be seen at sick call on May 3, 2016. (Doc. 65-8 at 12). Again on May 19, 2016, the plaintiff filed a sick call request stating he was in pain, that his prescription for Gabapentin ran out and needed to be renewed, that ibuprofen was not helping and that he wanted to see a doctor. (Doc. 65-5 at 16). The plaintiff was seen on May 23, 2016, at which time he again complained of discomfort while rating his pain as a 0. (*Id.*, at 14).

---

[26] The plaintiff was seen for a dental examination on April 15, 2016. (Doc. 65-4 at 18).

On May 26, 2016, the plaintiff reported to the medical staff that he had swallowed a razor blade. (Doc. 65-5 at 13). He was noted to have a two inch laceration to his neck. (*Id*.). The plaintiff was taken to a hospital emergency room, where a foreign object was detected in the plaintiff's bowels. (Doc. 65-6 at 25). Attempts to extract the object were unsuccessful, and he was discharged the following day with prescriptions for Welbutrin, Vistaril and Seroquel. (Doc. 65-6 at 22). He explained, "I had a manic attack, slit my throat, and swallowed razors." (Doc. 65-6 at 20). The plaintiff was admitted to the infirmary on suicide watch, and discharged back to ADOC on June 2, 2016. (Doc. 65-4 at 11).

While the plaintiff was housed in segregation in April 2016, because he had been labeled a "snitch" inmate Antwone Wilson threw excrement at the plaintiff and hit him with a broom through the tray door slot on multiple occasions. (Doc. 12-1 at 9). Because inmate Wilson was the dorm janitor and prepared the shower list for the officers, the plaintiff had no means to clean his cell or bathe. (*Id.*, at 9-10). The plaintiff asserts he complained in writing to Wardens Carter, Estes, and Sparks as well as Commissioner Dunn, but they did nothing. (*Id.*). Finally, other SCCF officers caught inmate Wilson in the act and moved the plaintiff to another disciplinary cell.[27] (*Id.*, at 9).

---

[27] Neither the defendants nor the plaintiff address these factual allegations in the pending motions for summary judgment or in the responses thereto. The undersigned therefore considers

The plaintiff alleges that Commissioner Dunn and Wardens Carter, Estes and Specks' failure to hire and train sufficient officers in an adequate manner resulted in their failure to protect the plaintiff.[28] (Doc. 12-1 at 17). Moreover, if Warden Carter, Captain Graham, Ms. Coogan and Mr. Payne had placed the plaintiff in protective custody or the TC dorm when he asked, the plaintiff would not have been used for sex, raped, beat up, held hostage, and had money extorted. (*Id.*).

## IV. Analysis

As previously noted, the plaintiff asserts he was kidnapped, sold, raped, and beaten by other inmates. The defendants respond that none of this occurred, and instead, the plaintiff was high on drugs and other prison inmates were trying to help him. In ruling on summary judgment motions, the court must "'resolve all reasonable doubts about the facts in favor of the non-movant" and "draw 'all justifiable inferences . . . in his favor.'" *Sultenfuss v. Snow*, 35 F.3d 1494, 1499

---

any claim arising from these allegations to have been abandoned. See e.g., *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (citing *Lyes v. City of Riviera Beach, Fla.,* 126 F.3d 1380, 1388 (11th Cir. 1997) ("grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned"), *reh'g granted and vacated by,* 136 F.3d 1295 (1998), *reinstated by*, 166 F.3d 1332, 1336 (11th Cir. 1999); *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp*., 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").

[28] Neither the defendants nor the plaintiff address the failure to hire and train claim. The undersigned therefore considers this claim to have been abandoned.

(11th Cir. 1994) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991).  For purposes of summary judgment, a genuine issue of material fact exists if the nonmoving party has produced evidence such that a reasonable fact-finder could return a verdict in its favor.  *Waddell v. Valley Forge Dental Assocs., Inc.,* 276 F.3d 1275, 1279 (11th Cir. 2001).  However, because the plaintiff is *pro se*, the court must "credit the 'specific facts' plead in his sworn complaint when considering his opposition to summary judgment."  *Burke v. Bowns*, 653 Fed.App'x 683, 694 (11th Cir. 2016) (*quoting Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014))

Despite the plaintiff's various labels for his claims, the majority of his claims fall into two categories under the Eighth Amendment, deliberate indifference to safety and deliberate indifference to serious medical needs.[29]  The Eighth Amendment prohibits deliberate indifference to an inmate's health or safety.  *Hope v. Pelzer*, 536 U.S. 730, 737-38 (2002).  A prison official acts with deliberate indifference to an inmate's safety when he "knows of and disregards an excessive risk to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 837

---

[29] The plaintiff styles his first claim as a violation of his Eighth Amendment right to be free from cruel and unusual punishment.  (Doc. 12-1 at 6).  His factual allegations in support of this claim are indistinguishable from the factual allegations in support of his second claim, which is labeled as an Eighth Amendment failure to protect claim.  (*Id*., at 10).  Therefore, finding no basis in the plaintiff's first claim for a separate constitutional violation, the court considers all of the facts from the plaintiff's first two claims as to whether a failure to protect claim is stated.

(1994).  Similarly, a prison official acts with deliberate indifference to an inmate's medical needs by denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  *Erickson v. Pardus*, 551 U.S. 89, 90 (2007).

A.  **Official Capacity Claims against all Defendants**

To the extent that the plaintiff brings this action against each of the defendants in his or her official capacity, the defendants are immune from monetary damages.  Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

> A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, [59] (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities.

*Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

Because all of the named defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages

from them in their official capacities, any such claims the plaintiff brings are due to be **DISMISSED.**

### B.  Injunctive Relief

To the extent the plaintiff is bringing claims for injunctive relief against the state defendants in their official capacities, those claims were mooted by the plaintiff's transfer to Limestone Correctional Facility.  *See McKinnon v. Talladega County*, 745 F.2d 1360, 1363 (11th Cir. 1984); *Johnson v. Warden*, 491 Fed.App'x 60, 62 n.1 (11th Cir. 2012) (citing *Zatler v. Wainwright*, 802 F.2d 397, 399 (11th Cir. 1986)).  *See also Spears v. Thigpen*, 846 F.2d 1327, 1328 (11th Cir. 1988) (injunctive relief claim becomes moot when prisoner transferred because after transfer, no case or controversy exists) (citing *Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985)).  Therefore, the plaintiff's claims for injunctive relief are due to be **DISMISSED** as **MOOT**.

### C.  Individual Capacity -- Failure to Protect

The Eighth Amendment "imposes a duty on prison officials" to "take reasonable measures to guarantee the safety of the inmates."  *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (alterations omitted).  Yet, while prison officials have this general duty to protect inmates from violence by other prisoners, they are not

the guarantors of a prisoner's safety. *Morgan v. Toombs Co., GA.*, 400 F.3d 1313, 1321 (11th Cir. 2005). To establish a violation of the Eighth Amendment, a plaintiff must show a "substantial risk of serious harm" and that the defendants were "deliberately indifferent" to that risk. *See Farmer*, 511 U.S. at 834. Thus, a prison official violates the Eighth Amendment "when a substantial risk of serious harm, of which the official is subjectively aware, exists . . . the official does not respond reasonably to the risk," and the official's actions or inaction causes the injury. *Caldwell*, 748 F.3d at 1099 (quoting *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003); *see also Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013).

When considering whether a substantial risk of serious harm is alleged, the court uses an objective standard. *Caldwell*, 748 F.3d at 1099 (citing *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1028–29 (11th Cir. 2001) (en banc), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). The second element–the defendant's deliberate indifference to that risk–has two components, one subjective and one objective. To satisfy the subjective component, a plaintiff must produce evidence that the defendant "actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm." *Caldwell,* 748 F.3d at 1099 (citing *Rodriguez v. Sec'y for Dep't of Corr.,* 508 F.3d 611, 617 (11th Cir. 2007)

(alterations in original). To satisfy the objective component, a plaintiff must produce evidence that the defendant "disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner." *Id.* (citing *Rodriguez*, 508 F.3d at 617). Additionally, the plaintiff must present evidence that the acts or omissions of the defendants caused his injuries. *See Farmer*, 511 U.S. at 837-838.

"Deliberate indifference describes a state of mind more blameworthy than negligence," and an ordinary lack of due care for a prisoner's interest or safety will not support an Eighth Amendment claim. *Farmer*, 511 U.S. at 835. "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990); *see also Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003). Rather, deliberate indifference "requires proof of more than gross negligence." *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010); *see also Goodman v. Kimbrough* 718 F.3d 1325, 1332 (11th Cir. 2013). Such disregard must also be more than a lack of ordinary due care for a prisoner's safety. *Davidson v. Cannon*, 474 U.S. 344, 347-348 (1986). To state a cause of action under § 1983, the allegations must rise to the level of "a conscious or callous indifference to a prisoner's rights." *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982) (citations omitted).

Thus the court considers the plaintiff's failure to protect claim as it relates to each of the named prison defendants.

### 1. *Commissioner Dunn and Wardens Carter, Estes, and Specks*

The plaintiff claims that Commissioner Dunn has the duty and obligation to ensure that wardens of the various Alabama prisons are properly running the prisons. (Doc. 12-1 at 8). The plaintiff asserts that Commissioner Dunn is aware that his policies are not being followed at SCCF, but has taken no action to enforce his policies. (*Id.*, at 9). The plaintiff points to Wardens Specks, Estes, and Carter's failure to ensure officers were stationed in the dorms to protect inmates and reduce violence and contraband. (Doc. 12-1 at 8). As evidence of deliberate indifference, the plaintiff further claims that Commissioner Dunn and Wardens Carter, Estes, and Specks are aware of the problems and violations of constitutional rights occurring at SCCF but have done nothing the correct the issues. (*Id.*, at 9).

To the extent the defendants argue that Commissioner Dunn and Wardens Carter, Specks, and Estes cannot be held liable in their role as supervisors, the plaintiff agrees and states he is not asserting these defendants are liable in this capacity. (Doc. 88 at 33-34). Rather, the plaintiff argues that he seeks to hold each of these defendants liable because a causal connection exists between the

supervisor's actions and the alleged constitutional violation.  (Doc. 88 at 33-34); *see also Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).

The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation and he fails to do so, or when his customs or policies result in deliberate indifference to constitutional rights. *Oliver v. Harden*, 587 Fed.App'x 618, 620 (11th Cir. 2014).  *See also Cottone v. Jenne*, 326 F.3d 1352, 1360-61 (11th Cir. 2003).  "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."  *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999).  A generalized policy of understaffing has been held insufficient to meet this burden.  *McDowell v. Brown*, 392 F.3d 1283, 1291 (11th Cir. 2004).  Rather, a plaintiff must show a "deliberate intent to inadequately staff a prison.  *Id*.

According to the plaintiff, the history of widespread abuses alleged by him satisfies this standard.  (Doc. 88 at 34).  Applying the foregoing law to the facts of this case, the plaintiff alleges that Warden Carter was notified by Mr. Payne that the plaintiff was being bought and sold by other inmates and that Warden Carter

did nothing.[30] (Doc. 12-1 at 13). Despite this allegation, the evidence fails to support any inference that Warden Carter was notified of the events, and there is no basis on which the plaintiff could have personal knowledge that Mr. Payne reported them to Warden Carter. There simply is no evidence that Carter was aware of the plaintiff's abuse before March 9, 2016.

The plaintiff also alleges that Warden Specks was present at the plaintiff's segregation hearing, where the plaintiff appeared bruised and in soiled clothing. (*Id*., at 20-21). The plaintiff told them that he had no clothes, had not had a shower in almost two weeks, did not have any of his property and had broken ribs and a broken finger. (*Id.,* at 21).

Finally, in April 2016 when he was being abused by inmate Antwone Wilson, the plaintiff asserts he reported this to all three wardens and Commissioner Dunn, but none of them did anything to prevent further abuse. (Doc. 12-1 at 9). Defendant Carter responds to the plaintiff's allegations that she had no knowledge of the plaintiff's claim of sexual assault, she personally had received no request for assistance, and had no personal contact with the plaintiff. (Doc. 61-11). Defendant Specks claims he never received a request from the plaintiff to be placed in protective custody or otherwise transferred. (Doc. 61-10). Defendant

---

[30] In his amended complaint, the plaintiff asserts that Mr. Payne notified Warden Carter that the plaintiff was being bought and sold. However, all of the evidence supports a finding that Mr. Payne actually reported this allegation to defendant Warden Specks.

Estes notes in his affidavit the events asserted by the plaintiff. (Doc. 61-3). In reviewing the February 12, 2016 events, defendant Estes makes no mention of the plaintiff's claim that he was bought and sold by other inmates, but only that the plaintiff signed a "Release of Liability." (*Id.*, at 1-2). In regard to the claims based on March 9, 2016, defendant Estes avers that while at the Rape Crisis Center, the nurses asked that the plaintiff's handcuffs be removed. (*Id.*, at 2). This request was denied "due to the potential for violence by inmate Jacoby." (*Id.*). Therefore, the plaintiff was returned to SCCF without a rape examination. (*Id.*). Finally defendant Estes alleges that the "incident of March 9, 2016, continues to be investigated by I&I" (*id.*), which is clearly contradicted by the I&I report itself. (Doc. 61-1 at 9-10).

Construing the evidence in the light most favorable to the plaintiff, the defendants' motion for summary judgment (doc. 61) is due to be **GRANTED** as to defendant Dunn. At best, the plaintiff asserts that Dunn was aware that SCCF was understaffed. While staffing shortfalls raise concerns, such knowledge, standing alone, is insufficient to demonstrate that Commissioner Dunn objectively knew that the plaintiff needed protection from other inmates, but failed to act reasonably. *See e.g., Carter*, 352 F.3d at 1349 (for knowledge to rise to a sufficient level of culpability, "there must be much more than mere awareness"). A policy of

understaffing, without more, is insufficient to meet the plaintiff's burden. *McDowell*, 392 F.3d at 1291.

As to each of the wardens, a reasonable inference from the plaintiff's sworn allegations in his complaint and the evidence submitted is that defendant Specks was aware of the specific abuse the plaintiff claimed to have suffered at the hands of other prisoners. Moreover, defendant Specks knew of the general conditions as alleged by the plaintiff because he was told by Captain Graham. As previously stated, "[d]eprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). The plaintiff makes such allegations here. *See Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) (the plaintiff must show that each particular defendant "was himself deliberately indifferent to the plaintiff's health and safety."). The requisite knowledge of a substantial risk may arise out of an environment of longstanding and pervasive attacks to which all prisoners in the plaintiff's situation are exposed, whether from single or multiple sources. *Farmer*, 511 U.S. at 843; *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).

Here, the plaintiff alleges that the three warden defendants, as supervisors of SCCF, were aware of the substantial risk of serious harm to inmates in that prison.

The plaintiff makes claims of widespread weapons, drug use, lack of control, lack of cell inspection, and chronic understaffing. The defendants' argument against imposing liability is that the plaintiff was believed to be on illegal substances and that cell phone video taken by an inmate was used to support that same inmate's claim he did not rape the plaintiff. The defendants do not refute that cell inspections are infrequent enough that inmates do not sleep in their assigned cells, or that they swap cells at will.[31]

An Eighth Amendment claimant need only show that a prison official "acted or failed to act despite his knowledge of a substantial risk of serious harm," and not that the action or inaction was undertaken "believing that harm actually would befall an inmate." *Caldwell*, 748 F.3d at 1102 (citing *Farmer*, 511 U.S. at 842). However, the plaintiff cannot demonstrate that Wardens Carter or Estes had any reason to be aware of a particular danger to the plaintiff before March 9, 2016. In contrast, sufficient evidence supports an inference that Specks knew the plaintiff claimed to have been bought and sold by various inmates and took no action to protect him. The plaintiff does not need to show that defendant Specks knew which specific inmates were a danger to the plaintiff or that defendant Specks

---

[31] In his response to the prison defendants' motion for summary judgment, the plaintiff states "[i]nmates literally ran the prison at will, everyone had knives, cell phones and dope. Inmates were getting high everywhere, shooting dope, talking on phones, selling dope and junked out." (Doc. 88 at 6).

specifically intended to allow other inmates to continue their treatment of the plaintiff. *Id.*

Specifically, the prison's own records reflect that in February 2016, although the plaintiff denied any sexual assault, he told defendant Payne that "he was tired of being bought and sold out to different inmates" without any further action being taken. (Doc. 61-1 at 2). According to defendant Coogan, on February 12, 2016, the plaintiff told her he had been bought and sold into unwanted relationships. (Doc. 62-1 at 4). Coogan reported this to Richard Payne, her supervisor (*id*.), who in turn notified the Lieutenant Gordy, the PREA compliance manager for SCCF. (Doc. 62-2 at 5). Payne also reported the allegations to Captain Graham, the shift commander (*id*.), and Warden Specks (doc. 61-1 at 2). Additionally, while the defendants suggest that the plaintiff was intoxicated on various substances, and harmed himself of March 9, 2016, this is contradicted by Dr. Wilson's instructions to take the plaintiff to the Crisis Center and by the lack of any credible evidence to support a finding that the plaintiff was under the influence of any substance.[32] According to the plaintiff, he was drug tested on March 9, 2016, and the results

---

[32] As previously noted, the only evidence supporting the defendants' allegations that the plaintiff harmed himself was all produced by the very inmate the plaintiff accused of buying him, holding him hostage, and raping him.

were negative.[33]  (Doc. 88 at 34).  In the light most favorable to the plaintiff, whether he was raped or inflicted self-injury due to intoxication is a genuine issue of material fact.  Moreover, the source of the plaintiff's injuries on March 9, 2016, have little bearing on defendant Specks' liability for taking no action on the plaintiff's claim he was tired of being bought and sold by other inmates in the prior month.  Whether this knowledge is sufficient to support a finding of deliberate indifference to the plaintiff's safety is a matter for a trier of fact to decide.

The defendants' motion for summary judgment (doc. 61) on the plaintiff's failure to protect claim against the wardens is **DENIED** as to defendant Specks. Evidence demonstrates that this defendant, at least by February 12, 2016, had actual knowledge of the plaintiff's allegations of being bought and sold by other inmates and took no action.  *See Ingraham v. Wright*, 430 U.S. 651, 673 (1977) (holding that the right to personal security is a fundamental interest protected by the constitution).  However, the plaintiff has failed to demonstrate that defendants Carter or Estes had personal knowledge of the plaintiff's allegations of being bought and sold, such that they knew the plaintiff needed protection.  The defendants' motion for summary judgment (doc. 61) on the plaintiff's failure to

---

[33] Neither the plaintiff nor any of the defendants submitted the results of any drug test on the plaintiff.  In response to the plaintiff's discovery request for any positive drug test, the prison defendants responded that they "possess[ed] nothing responsive to this request."  (Doc. 91 at 114).  According to defendant Specks' interrogatory answers, the plaintiff has not had any positive drug tests in the five years he has been incarcerated.  (Doc. 91 at 129).

protect claim is therefore due to be **GRANTED** as to defendants Carter and Estes, as the plaintiff makes no allegations which would demonstrate these defendants had more than general awareness of the conditions impacting the plaintiff.

### 2. *Captain Graham*

The same analysis applies to the plaintiff's failure-to-protect claim against Captain Graham. According to defendant Graham's own statement in the February 12, 2016, incident report, the plaintiff told her he did not need PREA involvement, but he was tired of being bought and sold by other inmates. With this knowledge, defendant Graham had the plaintiff sign a waiver of liability and a living agreement, and then returned him to population. (Doc. 61-1 at 2-5). While defendant Graham now asserts that the plaintiff signed a statement that no sexual assaults occurred on February 12, 2016 (doc. 61-2 at 1-2), she provides no explanation as to why she considered only whether the plaintiff had been assaulted on that *particular* date, and not consider the history of plaintiff's abuse over a period of time. A reasonable trier of fact could certainly find that Captain Graham turned a blind eye to the abuse the plaintiff alleged he was suffering and find in the plaintiff's favor on his claim of failure to protect. The defendants' motion for summary judgment (doc. 61) is therefore **DENIED** as to defendant Graham.

### 3. Mental Health defendants Dorothy Coogan and Richard Payne

Defendants Dorothy Coogan and Richard Payne are employees of MHM Services, Inc., assigned to work at St. Clair Correctional Facility. (Doc. 62-1 at 2-3, 62-2 at 2). The plaintiff alleges that he reported his treatment by inmates Burt and Bufford to defendants Graham, Coogan, and Payne. This report included claims of drug use, forced sex, extortion, and the sale of the plaintiff between these inmates. He further asserts that these defendants agreed to move the plaintiff to L-11 Dorm until the plaintiff could get into the T.C. program. (Doc. 12-1 at 12). However, the plaintiff was not moved. (*Id.*, at 13).

Defendants Coogan and Payne do not dispute that the plaintiff reported to them on February 12, 2016, that he was tired of being bought and sold. (Doc. 62-1 at 3-4; doc. 62-2 at 3-4). However, they deny their actions were in deliberate indifference to the health and/or safety of the plaintiff. When the plaintiff told Coogan that he was being bought and sold and had been beat up, Coogan told Payne, who was her supervisor. (Doc. 62-1 at 3-4; doc. 62-2 at 4). The plaintiff's complaints at that time concerned inmate Bufford, who, in an unrelated incident, had been stabbed. (Doc. 91 at 100). The plaintiff's mental health records reflect that on February 12, 2016, he reported to Coogan "I been sold – unwanted relationships. Use spice every day when I can . . . . Guy that got stabbed was the

one who bought me and beat me up. I felt better [when] I found out that he got stabbed. My bill got paid yesterday. The dude who bought me paid $175.00. He was short $75.00. I paid it." (*Id*.). In accordance with procedure, Payne notified ADOC PREA officials for an investigation. (Doc. 62-2 at 4-5).

According to the plaintiff, when he met with Payne on March 8, 2016, Payne stated he thought the plaintiff had been moved to the T.C. Program. (Doc. 89 at 4). At that time, the plaintiff told Payne he was still having problems with unwanted relationships, extortion, and being held in the dorm.[34] (*Id*., doc. 91 at 165). Payne again promised to call defendant Graham to have the plaintiff moved. (Doc. 89 at 4).

As employees of MHM, Inc., neither Dorothy Coogan nor Richard Payne could have the plaintiff placed in protective custody.[35] (Doc. 62-1 at 3, 5; doc. 62-2 at 3, 6). These defendants' actions do not demonstrate that either of them knew of a substantial risk of serious harm that was ignored by them. Rather, upon the plaintiff reporting his living conditions to defendant Coogan, she notified Richard Payne, who in turn notified prison officials for an investigation.

_____

[34] That record of mental health counseling also reflects that the plaintiff stated he liked "smoking pot and no show spices." (Doc. 91 at 165). Payne specifically asked on March 8, 2016, whether the plaintiff had PREA issues and the plaintiff denied any. (*Id*.).

[35] Only if an inmate poses a risk to himself or others do Coogan and Payne have any authority over an inmate's housing placement. (Doc. 62-2 at 3).

The plaintiff asserts that the defendants have a duty to protect him under the PREA. (Doc. 89 at 7). Although the plaintiff relies on defendants Coogan and Payne's failure to follow PREA regulations (doc. 89 at 7-9), the failure to follow internal regulations is not a basis for constitutional liability. Prison officials are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Not every deviation from an agency's rules violates of the Constitution. *Smith v. State of Georgia*, 684 F.2d 729, 733 n. 6 (11th Cir. 1982). Moreover, the PREA does not confer a private right of action on individuals. *Gibson v. Kent*, 2016 WL 7384646, at *2 (N.D.Fla. 2016) ("Nowhere in the PREA is there language to suggest that part of its purpose was to create a private cause of action or a federal right which could be enforced in a Section 1983 action."). Rather, the PREA was enacted to "address the problem of rape in prison, authorize[ ] grant money, and create[ ] a commission to study the issue." *Chinnici v. Edwards,* 2008 WL 3851294, at *3 (D.Vt. 2008). It "does not grant prisoners any specific rights." *Id. See also J.K.J. v. Polk Cty.*, 2017 WL 28093, *12 (W.D. Wis. 2017) ("[T]here is no private right of action under the PREA."); *Garness v. Wisconsin Dep't of Corr.*, 2016 WL 426611, at *2 (W.D.Wis. 2016) (no personal right to sue for failure to

comply with the Act's requirements exists); *Alexander v. Steele Cty. Jail*, 2014 WL 4384452, *7 (D.Minn. 2014).  Thus, whether or not defendants Coogan and Payne complied with various sections of the PREA does not provide any basis for liability.  For purposes of the Eighth Amendment, they made appropriate reports to prison officials for further investigation.  In short, Coogan and Payne did all that was available to them.

Because these facts fail to demonstrate deliberate indifference to the plaintiff's safety or any other potential violation of the plaintiff's constitutional rights, defendants Dorothy Coogan and Richard Payne's motion for summary judgment (doc. 62) is due to be **GRANTED**.

### 4. *Officers Gaines and Tarrant Payne*

According to the plaintiff, both of these defendants watched a cell phone video of him being sexually abused by other inmates on March 7 and 8, and did nothing, allowing the abuse to continue until plaintiff escaped his abusers on March 9.  These two defendants deny ever seeing such a video.  Clearly, if these defendants watched such a video and then took no action to protect the plaintiff from further abuse, a reasonable trier of fact could find this to constitute deliberate indifference in violation of the plaintiff's Eighth Amendment rights.  *See e.g., Mize v. Jefferson City Board Of Education*, 93 F.3d 739, 749 (11th Cir. 1996) ("Where

the non-movant presents evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence. It is not the court's role to weigh conflicting evidence or to make credibility determinations . . . . "). Because the undersigned must construe the facts in the light most favorable to the plaintiff, including that Gaines and Tarrant Payne viewed videos of the plaintiff's abuse at a time they could have prevented further abuse, and the defendants have not submitted the videos they claim show the plaintiff engaging in self-harm, the defendants' motion for summary judgment (doc. 61) is due to be **DENIED** on the plaintiff's failure-to-protect claims against defendants Gaines and Tarrant Payne.

5. *Lieutenant Jones, Sergeant Truitt, Officer Guthery, and Officer Tarrant Payne*

The plaintiff alleges that each of these defendants either made the decision or followed an instruction for the plaintiff to be handcuffed behind his back for transport to the Crisis Center. Neither the decision to handcuff the plaintiff behind his back nor the decision not to remove the handcuffs for an examination states a claim of constitutional proportion. Even if it could rise to the level of an Eighth Amendment denial of medical care, plaintiff does not dispute that he had threatened to "fight" the officers, and thus they had reasonable cause to continue his restraints. Moreover, while plaintiff was transported to the Crisis Center for a

rape examination, there is no evidence that he was denied medical treatment, but rather, chose not to be examined if it meant his clothing had to be cut off.  As this is the only allegation the plaintiff makes against defendant Guthery, the defendants' motion for summary judgment (doc. 61) is due to be **GRANTED** as to him.  Similarly, the plaintiff's allegations against Lieutenant Jones and Sergeant Truitt---that they knew Guthery and Tarrant Payne would not handcuff the plaintiff with his hands in front of him instead of behind him---fails to state a claim on which relief may be granted.  The motion for summary judgment as to defendants Jones and Truitt based on how the plaintiff was handcuffed is also due to be **GRANTED**.

However, the plaintiff also asserts in his amended complaint (Doc. 12-1) that both defendants Jones and Truitt saw the videos of Jenkins' alleged treatment of the plaintiff and took no action.  (Doc. 12-1 at 17).  Although the amended complaint is sworn, this evidence is not substantial.  Plaintiff asserted that, while he was at the Crisis Center, Jenkins showed the videos to "[officer] Turner, Lt. Jones and maybe Sgt. Truitt."  This clearly is speculation by the plaintiff as he could not have personal knowledge this occurred.  He admits he was away from the institution and did not witness any such viewing.  Even in the light most favorable to the plaintiff, this evidence is insufficient to allow the failure to protect

claim to proceed against defendants Jones and Truitt. Their motion for summary judgment (doc. 61) is due to be **GRANTED** as to the plaintiff's failure-to-protect claim.

### 6. *Defendant Malone*

The plaintiff's sole claim against defendant Malone is that when the plaintiff appeared before the segregation board on March 16, 2016, defendant Malone and others did not get him to see a doctor. (Doc. 12-1 at 21). Because the plaintiff was seen by a health care professional on March 16, 2016, and multiple dates following, nothing in this allegation can support a finding of deliberate indifference. The defendants' motion for summary judgment is due to be **GRANTED** as to defendant Captain Malone.

### D. Prison Conditions Claim

Claims concerning prison conditions are analyzed under the same Eighth Amendment standard as a failure to protect claim. A plaintiff must show that "a substantial risk of serious harm, of which the official is subjectively aware, exists[,] the official does not respond reasonably to the risk," and the official's actions or inaction causes the injury. *Caldwell*, 748 F.3d at 1099 (citations ommitted). The court must apply a two-part analysis to Eighth Amendment challenges to prison conditions. *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th

Cir. 2004). First, under the "objective component," a prisoner must prove that the condition he complains of is "harmful enough" to violate the Eighth Amendment. *Hudson v. McMillan*, 503 U.S. 1, 8 (1992). The challenged condition must be "extreme." *Id*., at 9. The second part of the two-part analysis is the "subjective component," that the defendant prison officials "acted with a sufficiently culpable state of mind" with regard to the condition at issue. *Hudson, id.,* at 8 (alterations and citation omitted).

Although negligence does not suffice to satisfy this standard, *Wilson v. Seiter*, 501 U.S. 294, 305 (1991), a prisoner need not show that the prison official acted with "the very purpose of causing harm or with knowledge that harm [would] result," *Farmer*, 511 U.S. at 835. In defining the deliberate indifference standard, the *Farmer* Court stated, "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.

Here, the plaintiff alleges he was sexually assaulted, kidnapped, beaten, and sold by various inmates. He alleges that the conditions of the prison, such as cells

that did not lock, the failure to adequately staff the prison, the failure to conduct weapon, phone, or cell searches, and the failure to require prisoners to sleep in their own cells, led to his abuse.[36] (*See e.g.,* doc. 88 at 5-6). The facts supporting this claim are the same facts the plaintiff has used to support his failure to protect claim and, indeed, merely repleads his failure-to-protect claims. He alleges he reported these conditions to multiple wardens and other prison officials and nothing was done. The court finds the case of *Diamond v. Owens* instructive. There, the court found

> While [the plaintiff] does not concede that Lewis and McCracken did not have subjective awareness of the risk of harm before the first assault that occurred on their respective watches, she alleges that after they received notice of that assault, and then the next, and the next, and so on, they clearly had subjective awareness of the risk of harm she faced as a transgender inmate housed with violent offenders. Repeatedly, she alleges, they continued to receive notice of her sexual assaults. Clearly, at this stage of the litigation, these facts are sufficient to establish that Lewis and McCracken were subjectively aware of the risk of harm Diamond faced. *See Farmer*, 511 U.S. at 842–43; *Bugge v. Roberts*, 430 Fed.App'x. 753, 761 (11th Cir. 2011) ("[T]he pervasive and widespread nature of the conditions ... suggest [the defendant] 'had been exposed to information concerning the risk and thus must have known about it.' " (quoting *Farmer*, 511 U.S. at 842–43)).
>
> In sum, these allegations are not threadbare recitations of the subjective awareness element. Rather, Diamond alleges the full gamut of facts *Farmer* contemplated to show subjective awareness.

---

[36] In discovery, the plaintiff specifically asked for "bed roster head counts [taken] to make sure all inmates are in their assigned living areas." (Doc. 91 at 114). The prison defendants responded that they had no such documents. (*Id.*).

Yet, despite being aware of the risk of sexual assault and despite having the authority and obligation to take reasonable safety measures after each incident, Lewis and McCracken, according to Diamond, failed to take any action. As a result, the substantial risk of harm remained unabated, and Diamond suffered further sexual assaults. Clearly, Diamond has sufficiently alleged a plausible failure-to-protect claim against Lewis and McCracken.

*Diamond v. Owens*, 131 F.Supp.3d 1346, 1378-79 (M.D. Ga. 2015).

Similarly, here the plaintiff alleges that defendants Carter, Estes and Specks were "deliberately indifferent to the plaintiff's health and safety." *Richardson*, 598 F.3d at 738. The plaintiff asserts, and a reasonable trier of fact could find, that defendant Specks knew the plaintiff claimed to have been bought, sold and/or sexually abused by other inmates, and that this was allowed to occur because of how SCCF was run. Such allegations, in a sworn complaint, are sufficient for the plaintiff's prison conditions claim to survive summary judgment against defendant Specks. However, the plaintiff has produced no evidence concerning the knowledge of the effect of the prison conditions on the plaintiff by defendants Carter and Estes.

An Eighth Amendment claimant need only show that a prison official "acted or failed to act despite his knowledge of a substantial risk of serious harm," and not that the action or inaction was undertaken "believing that harm actually would befall an inmate." *Caldwell*, 748 F.3d at 1102 (citing *Farmer*, 511 U.S. at 842).

Thus, the plaintiff's allegation that defendant Specks knew of his repeated requests to be moved to another dorm for his own safety, because he was tired of being bought and sold, is sufficient to survive the motion for summary judgment.

Given the plaintiff's sworn statements and the defendants response, the undersigned finds a genuine issue of material fact exists on the issue as to whether defendant Specks was aware of the prison conditions alleged by the plaintiff and if so, whether the defendants failed to act in spite of that knowledge. The motion for summary judgment (doc. 61) is due to be **DENIED** as to the claim for prison conditions against defendant Specks.[37] The motion for summary judgment as to this claim by Carter and Estes is due to be **GRANTED**.

### E. **Qualified Immunity - Individual Capacity Claims**

"Qualified immunity protects all by the plainly incompetent or one who is knowingly violating the federal law." *Gilmore v. Hodges*, 738 F.3d 266, 277 (11th Cir. 2013) (citations omitted). Because the plaintiff has put into evidence facts sufficient for a reasonable trier of fact to conclude that a violation of the plaintiff's

---

[37] The plaintiff also asserts that the conditions to which he was subjected while he was in disciplinary segregation, from March 9, 2016, until March 16, 2016, violated his constitutional rights. According to the plaintiff, defendants Specks and Malone saw that he was still in the same soiled clothes that entire time. (Doc. 88 at 15). Additionally, the plaintiff claims he had no mattress, no clothes, no sheets, and no hygiene products. (*Id.*). The plaintiff continues that, at his hearing, defendant Specks told defendant Malone to provide the plaintiff with clothes and the other items, and the plaintiff received these things. (*Id.*). Because the plaintiff presents no evidence that defendants Specks or Malone know the plaintiff was missing these items prior to March 16, 2016, the plaintiff cannot establish liability for the conditions in segregation.

constitutional rights occurred, the court must next consider whether any or all of the defendants are entitled to summary judgment on the basis of qualified immunity.[38] "Qualified immunity is a guarantee of fair warning." *McElligott v. Foley*, 182 F.3d 1248, 1260 (11th Cir. 1999). It "protects government officials performing discretionary functions from liability if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1327 (11th Cir. 2003) (*quoting Hope v. Pelzer*, 536 U.S. 730, (2002)). Qualified immunity provides immunity from suit rather than a defense to liability, and "it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To receive qualified immunity, a government official must first prove that he was acting within his discretionary authority. *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003). From there, the burden shifts to the plaintiff to show qualified immunity should not apply. *Lee v. Ferrara*, 284 F.3d 1188, 1194 (11th Cir. 2002). The Supreme Court has created a two-part test for making this determination. First, the court must determine whether the plaintiff's allegations, if true, show the officer's conduct violated a constitutional right. *Hope*, 536 U.S.

---

[38] This discussion applies only to defendants Specks, Graham, Tarrant Payne, Gaines, Jones and Truitt. Having found no constitutional violation on the part of the other named defendants, those individuals have no need of the protections of qualified immunity.

at 736; *Gonzalez,* 325 F.3d at 1234.  The second prong of the test requires the court to determine whether the right was "clearly established" at the time of the violation.  *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11th Cir. 2009) (*quoting Saucier v. Katz,* 533 U.S. 194, 201 (2001)).  These two determinations may be made in either order at the discretion of the court.  *Lewis*, 561 F.3d at 1291 (*citing Pearson v. Callahan*, 555 U.S. 223 (2009)).

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (*quoting Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  "'To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority.'"  *Caldwell,* 748 F.3d at 1098 (*quoting Gonzalez v. Reno*, 325 F.3d 1228, 1233–34 (11th Cir. 2003)).  Here, the parties do not dispute that the defendants were acting within their discretionary authority at all relevant times.

For the reasons set forth previously, the court finds that the plaintiff's allegations concerning his failure to protect and prison conditions claims, if proved, establish violations of the plaintiff's constitutional rights.  Therefore, the plaintiff must show that the defendants are not entitled to qualified immunity.

*Brooks v. Warden*, 800 F.3d 1295, 1306 (11th Cir. 2015); *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007). To do so, the plaintiff must prove that (1) the defendants violated a constitutional right and (2) this right was clearly established at the time of the alleged violation. *Caldwell*, 748 F.3d at 1099. Regarding the first prong, the court must examine whether a jury could conclude that a violation occurred based on the evidence in the record. If so, the court proceeds to the second prong and ask whether, assuming a violation, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Cottone*, 326 F.3d at 1359.

In other words, the court must consider whether the law was clearly established before February 12, 2016, that ignoring a prisoner's claims that other inmates were buying and selling him for sexual purposes violated the plaintiff's constitutional rights. *See e.g.*, *Lewis*, 561 F.3d at 1291 (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about) the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Jenkins by Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 823 (11th Cir. 1997) (*quoting Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1150 (11th Cir. 1994)). "This is

not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent." *McElligott*, 182 F.3d at 1260 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted)). Officials can "be on notice that their conduct violated established law even in novel circumstances." *Hope*, 536 U.S. at 741.

With respect to the clearly established right element of a deliberate indifference claim, general legal principles announced by Eleventh Circuit decisions in this area of law are enough to make the right violated clearly established. *Hope*, 536 U.S. at 741. As previously determined, the plaintiff's pleadings establish that the defendants ignored the plaintiff's claims of abuse and being sold by other inmates. The allegations of the plaintiff's sworn amended complaint demonstrate that the defendant correctional officers were aware of the conditions the plaintiff alleged.

Applying this analysis to the claims for which the first prong has been met, as set forth above, the court looks to whether any case law established, before the plaintiff's claims arose, that conditions such as those alleged by the plaintiff--- letting the inmates run the prison, the buying and selling of inmates by other inmates, and the failure to protect inmates against sexual abuse---violated the

plaintiff's constitutional rights. The Supreme Court has instructed that this inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*quoting Saucier*, 533 U.S. at 201). Only "precedent of the Supreme Court of the United States, [the] precedent [of the Eleventh Circuit Court of Appeals], and the pertinent state's supreme court precedent, interpreting and applying the law in similar circumstances" are used in determining whether the law was clearly established. *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009). If there is no precedent on point, a right is clearly established only if the law has "earlier been developed in such [a] concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Muhammad v. Sapp*, 388 Fed.App'x 892, 898 (11th Cir. 2010) (*quoting Crawford v. Carroll*, 529 F.3d 961, 977-78 (11th Cir. 2008). "Exact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011).

As the plaintiff notes, *Farmer v. Brennan*, 511 U.S. at 828, "clearly established" that deliberate indifference to a prisoner's safety violates the Constitution. (Doc. 88 at 29). However, the plaintiff may not rely solely on his

claims that he is a "feminine, gay, smaller size white male" to establish deliberate indifference. (*Id.*, at 28). Rather, as detailed above, the plaintiff must demonstrate specific facts to show that each of the named defendants knew that the plaintiff was at risk of serious harm and took no actions to alleviate that risk. *See e.g., Brooks*, 800 F.3d at 1306 (holding that even in novel factual circumstances, officials can be put on notice that their conduct violates established law). A failure to protect a prisoner who asserts he is tired of being bought and sold by other inmates surely falls into the "rare case[ ] of 'obvious clarity,'" in which "conduct is so egregious that no prior case law is needed to put a reasonable officer on notice of its unconstitutionality." *Brooks*, 800 F.3d at 1307 (*quoting Gilmore*, 738 F.3d at 277). Defendants Specks, Graham, Gaines, and Tarrant Payne are not entitled to qualified immunity, whether viewed through the lens of prison conditions or failure to protect deliberate indifference claim. The egregiousness of having a prisoner who claims he is being purchased by other inmates sign a "Release of Liability" and place him back with those very inmates satisfies the "obvious clarity" standard.

Defendants Specks, Graham, Gaines, and Tarrant Payne's claims of entitlement to summary judgment based on qualified immunity are therefore **DENIED**.

F**. Deliberate Indifference to Medical Needs –** *Defendants Wilson and Hamby*

The plaintiff attempts to state a claim for deliberate indifference to medical needs against defendant Dr. Wilson and defendant Nurse Hamby. Not every claim by a prisoner that he has not received adequate medical treatment will state a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Negligence in treating a medical condition, including "an inadvertent failure to provide adequate medical care," does not state a valid claim for deliberate indifference. *Id*. at 105–06. *See also Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (merely accidental inadequacy is insufficient to state a claim under the Eighth Amendment). Even medical malpractice does not become a constitutional violation merely because the victim is a prisoner. *Estelle,* 429 U.S. at 106; *see also Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994). Medical treatment violates the Eighth Amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).

A viable claim for deliberate indifference to medical needs requires the plaintiff to allege facts to meet both an objective and a subjective component. *Bingham*, 654 F.3d at 1175. First, the plaintiff must demonstrate he has an "objectively serious medical need" that was either "diagnosed by a physician as

mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation omitted). To satisfy the subjective component, the plaintiff must establish that the official acted with "deliberate indifference" to the medical need. *McElligot*, 182 F.3d at 1254. Deliberate indifference has three requirements: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Id.*, at 1255.

In order to establish "subjective knowledge," a plaintiff must demonstrate that a "defendant actually knew of 'an excessive risk to inmate health or safety' and disregarded that risk." *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (*quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Subjective knowledge requires that a defendant "was 'both [ ] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [ ] must also [have] draw[n] the inference.'" *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008) (alteration in original) (quoting *Farmer,* 511 U.S. at 837). A defendant cannot be held liable for a constitutional violation for failing to alleviate a significant risk that he should have perceived but did not. *Id.,* at 1331 (citing

*Farmer,* 511 U.S. at 837). *See also Townsend v. Jefferson County*, 601 F.3d 1152, 1158-59 (11th Cir. 2010).

Defendants Wilson and Hamby assert that when a member of the nursing staff examined the plaintiff on March 9, 2016, the plaintiff did not report any indications that he had been the victim of sexual assault.[39] (Doc. 65-1 at 3). This claim is directly refuted by the body chart completed by a nursing staff member on that date, which explicitly noted that the plaintiff claimed to have been forced to perform deviant sexual acts. (Doc. 65-6 at 5). Moreover, other defendants assert that defendant Wilson made the decision to send the plaintiff to the Crisis Center for a rape examination.[40] Defendant Wilson offers no explanation as to why he would make such a decision if the plaintiff did not report sexual assault and the medical staff did not detect sexual assault.

Similarly, these defendants also refer to the plaintiff's complaints to defendant Hamby as arising from an "altercation." (Doc. 65 at 21). However, medical records created by defendant Hamby state that "Pt. submitted a grievance

---

[39] Although Dr. Wilson asserts in his affidavit that the plaintiff reported being in an "altercation" with other inmates (doc. 65-1 at 3), that is an inaccurate reflection of what the medical records state. (*See e.g.*, doc. 65-6 at 5). Similarly, in defendants' special report, Dr. Wilson's refers to his notes of June 28, 2016, as reflecting an "altercation." (Doc. 65 at 18). Those records actually state "Lt. Rib area pain-assault last summer & again March." (Doc. 65-4 at 13).

[40] For example, in the Incident Report completed by defendant Truitt, he states, "Doctor Walter Wilson authorized a medical transport to the Crisis Center." (Doc. 61-1 at 6).

r/t assault that occurred March 5th-9th & pain r/t rib fracture. Grievance discussed [with] Dr. Wilson . . . ."  (Doc. 65-5 at 20).

In spite of the foregoing, while the plaintiff's complaint and amended complaint allege multiple physical and mental problems which went untreated, the plaintiff's medical records do not support his allegations for purposes of the objective component of a deliberate indifference to serious medical needs claim. For example, while the plaintiff asserts he did not see a doctor for 34 days, despite repeated requests, the medical records reflect that the plaintiff was seen multiple times by nurses and nurse practitioners, and each of his reasonable medical complaints was addressed.  The plaintiff fails to pinpoint any specific care he needed, but did not receive.  The medical records submitted reflect that, in response to the plaintiff's March 13 and 14, 2016, sick call requests, he was seen and treated on March 16, 2016.[41]  (Docs. 65-1 at 3, 65-6 at 2-4).  The plaintiff filed further sick call requests on March 20, March 22, and March 23, 2016, again complaining of tenderness in his left rib cage and right hand, that he was coughing up blood and that he needed his mental health medication changed.  (Doc. 65-5 at 21, doc. 65-6 at 1; doc. 65-7 at 9).  A referral was made to mental health for the plaintiff's medication March 24, 2016.  (Doc. 65-7 at 8).  The plaintiff was

---

[41] No medical records of the plaintiff actually being examined for signs of sexual assault appear anywhere in the evidence submitted.  Rather, only the body chart and documentation for the plaintiff to be placed in segregation were completed.  (Doc. 65-4 at 7-8).

examined by a nurse practitioner on March 29, 2016. (Doc. 65-4 at 16). Again on March 30, 2016, the plaintiff saw the nurse practitioner. (Doc. 65-4 at 16). The plaintiff was told he could see Dr. Wilson, the medical director, but the plaintiff declined. (*Id*.). However, the nurse practitioner discussed the plaintiff's condition with Dr. Wilson, who instructed that the plaintiff be kept on Motrin for 30 days. (*Id*.). On April 5, 2016, the plaintiff refused to be seen by a doctor or make a sick call visit. (Doc. 65-8 at 20). The plaintiff saw Dr. Wilson on April 12, 2016. (Doc. 12 at 21). The plaintiff again submitted a request for health care on April 22, 2016, and was seen the same day. (Doc. 65-5 at 19). Each time the plaintiff presented at the health care unit, he was treated. The plaintiff's allegations against these defendants really amount to a claim that they did not provide the care the plaintiff wanted, such as stronger pain medication or seeing a doctor rather than a nurse.

Nowhere does the plaintiff allege any injury he suffered from seeing a nurse or nurse practitioner rather than a doctor. The plaintiff's claim that defendants Wilson and Hamby should have done something more to diagnose and treat him, while possibly in the realm of medical malpractice, does not rise to the level of a constitutional violation. *Campbell*, 169 F.3d at 1363. *See also Taylor v. Adams,* 221 F.3d 1254, 1258-59 (11th Cir. 2000); *Tucker v. Busbee,* 619 Fed. App'x 868,

871 (11th Cir. 2015) (holding mere negligence or medical malpractice are insufficient to state a claim for deliberate indifference). Based on the foregoing, defendants Wilson and Hamby's motion for summary judgment (doc. 65) is due to be **GRANTED** as to the plaintiff's Eighth Amendment medical care claims.

## G. PLRA

The prison defendants assert that the plaintiff's claims for damages are barred by the Prison Litigation Reform Act ("PLRA"), which states that a plaintiff can only recover damages for physical injuries which are more than *de minimus*. 42 U.S.C. § 1997e(e). The facts here, which include the sale of a human being, rape, sodomy, torture, documented bruising to the plaintiff's face and broken bones visible upon x-ray, are more than *de minimus*.[42] The defendants' other suggestion, that because the defendants themselves did not inflict these injuries the same are insufficient for purposes of the PLRA (doc. 61 at 11), has no basis in law. Moreover, even if the defendants were correct in their assertion that the plaintiff

---

[42] The prison defendants assert that "the only injury alleged by Thigpen (sic) as to the first claim was that he performed oral sex on another inmate, and his body chart reflects only bruises to his head and neck, which defendants contend came as the result of self-harm . . . ." (Doc. 61 at 11). Setting aside that the plaintiff in this action is Brent Jacoby, and not "Thigpen," the plaintiff actually alleges that he was forced to perform oral sex on another inmate and endured beatings, sodomy, extortion, and being bought, sold, and traded by various gang affiliated inmates. He had a broken rib in addition to his facial and neck bruising. He further alleges he was left without medical care although he was bleeding from his rectum. The defendants assertion that the plaintiff's injuries were self-inflicted, coupled with the plaintiff's assertion that they were not, with no evidence clearly proving how the plaintiff was injured, creates a triable issue of fact.

has not shown physical injury, nominal damages remain recoverable. *See Al-Amin v. Smith*, 637 F.3d 1192, 1198 (11th Cir. 2011). Therefore, the PLRA does not bar the plaintiff's claims.

## V. Recommendation

For the reasons stated above, the undersigned **RECOMMENDS:**

1. That all claims against all defendants in their official capacities be **DISMISSED**.

2. That the plaintiff's claims for injunctive relief be **DISMISSED** as **MOOT.**

3. That the prison defendants' motion for summary judgment (doc. 61) be **GRANTED** as to defendants Carter, Estes, Dunn, Truitt, Jones, Malone and Guthery, as no genuine issues of material fact exist as to these defendants.

4. That the prison defendants' motion for summary judgment (doc. 61) be **DENIED** as to defendants Specks, Graham, Gaines, and Tarrant Payne on the plaintiff's failure to protect and prison conditions claims.

5. That defendants Coogan and Richard Payne's motion for summary judgment (doc. 62) be **GRANTED** as no genuine issues of material fact exist as to these defendants.

6.   That defendants Wilson and Hamby's motion for summary judgment (doc. 65) be **GRANTED** as no genuine issues of material fact exist as to these defendants.

The undersigned further **RECOMMENDS** that the plaintiff's remaining claims be **REFERRED** to the undersigned for further proceedings.

### V. Notice of Right to Object

Any party may file specific written objections to this report and recommendation.  Any objections must be filed with the Clerk of Court within fourteen (14) calendar days from the date the report and recommendation is entered.  Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objection.  Failure to object to factual findings will bar later review of those findings, except for plain error.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013).  Objections also should specifically identify all claims contained in the complaint which the report and recommendation fails to address.  Objections should not contain new allegations, present additional evidence, or

repeat legal arguments. An objecting party must serve a copy of its objections on each other party to this action.

Upon receipt of objections, a United States District Judge will make a *de novo* determination of those portions of the report and recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings of fact and recommendations made by the magistrate judge. The district judge must conduct a hearing if required by law. Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence. Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record. The district judge also may refer this action back to the magistrate judge with instructions for further proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may only appeal from a final judgment entered by a district judge.

The Clerk is DIRECTED to mail a copy of the foregoing to the plaintiff.

DONE this 1st day of May, 2017.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE